**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **JACOB CORBIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CASE NO. 2:16-CV-00800-SRW** |
| **v.** | ) | |
| | ) | |
| **JACKSON HOSPITAL & CLINIC, INC.,** | ) | |
| | ) | **May 3, 2018** |
| **Defendant.** | ) | |

**PLAINTIFF CORBIN'S BRIEF IN OPPOSITION TO DEFENDANT JACKSON
HOSPITAL & CLINIC, INC'S MOTION FOR SUMMARY JUDGMENT**

**COMES NOW** the Plaintiff, Jacob Corbin, and hereby respectfully submits the following brief in opposition to Defendant Jackson Hospital & Clinic, Inc.'s Motion for Summary Judgment as to Plaintiff Corbin's claims:

## I.  STATEMENT OF FACTS

This case arises out of Defendant Jackson Hospital's decision to terminate Plaintiff Jacob Corbin from his position as Infrastructure Team Leader within Jackson Hospital's Information Technology (IT) Department.  (Doc. 1).  The IT department is managed by a director, who oversees three units: financial, clinical, and infrastructure.  Until early November 2013, each of the three IT units was managed by a "team leader."  The infrastructure team generally oversees the hospital's servers, workstations, printers, networks, telephones, and internet connectivity. Jacob Corbin was hired by Jackson in 2002 into a position within the Jackson Hospital's Information Technology (IT) department and he was subsequently promoted to Infrastructure Team Leader.  (Doc. 1, ¶8).

The IT department at Jackson Hospital services and maintains the hospital's computer systems, wired and wireless networks, telephone systems, electronic storage systems, and other electronic resources.  (Affidavit of Michael James, DX "B" at ¶3)

Mr. Corbin was diagnosed with narcolepsy with cataplexy by his neurologist, Dr. Rubin Richardson, in 2009.  (Corbin Depo. at 34:5 – 35:19; PX 4, p. 2)  Mr. Corbin's conditions cause him to have problems with sleepiness and they also make it difficult for him to remember details.  (Corbin Depo. at 31:14 - 32:3)  Narcolepsy is one of the conditions, for which Mr. Corbin has claimed, and was awarded Social Security disability benefits, on or about June of 2014.  (Corbin Depo. at 49:20-24; 51:1-10)

Mr. Corbin's immediate supervisor, at the time of his termination, was Kris Carpenter. His second-level supervisor was Vice President Rick Caldwell.  (Corbin Depo. at 85:5 - 86:13) Mr. Corbin got along well with Kris Carpenter before she became his supervisor.  (Corbin Depo. at 89:5-9; Darrington Depo. at 10:4-15)  After Ms. Carpenter became Mr. Corbin's supervisor, in 2010, he was diagnosed with narcolepsy.  Mr. Corbin reported this diagnosis to Ms. Carpenter. (Corbin Depo. at 129:4-11; Carpenter Depo. at 19:13-20:6)  In the next monthly department meeting, Ms. Carpenter pressured Mr. Corbin to stand up in a department meeting and explain his condition.  (Corbin Depo. at 173:7-17)  Mr. Carpenter also told a vendor representative that Mr. Corbin was diagnosed with narcolepsy and would not be available in the early morning or late at night.  (Corbin Depo. at 177:2-23)  Mr. Corbin was also subjected to ridicule and joking because of his narcolepsy.  (Ivery Depo. at 19:1-23)

In January of 2013, after Ms. Carpenter learned about Mr. Corbin's narcolepsy diagnosis, she attempted to change Mr. Corbin's job description and his work hours.  The change would

have required Mr. Corbin to be on call to handle computer network issues at Jackson Hospital at all hours of the day or night. (Corbin Depo. at 135:13-25)

On February 11, 2013, Mr. Corbin complained that Ms. Carpenter's attempt to change his work hours, was discriminatory against him due to his disability. (Corbin Depo. at 136:8 - 137:6; PX 5) Defendant's Vice President and Human Resources Officer, Gilbert Darrington, met with Ms. Carpenter and Mr. Corbin, on February 18, 2013, to discuss Mr. Corbin's complaint. Mr. Darrington did not allow Ms. Carpenter to change Mr. Corbin's schedule. (Corbin Depo. at 160:8-17; DX 1, 2)

During his tenure with Jackson Hospital, Mr. Corbin was considered a "Role Model" employee on all evaluations, except for his last one, dated June 1, 2013. "Role Model" was the highest possible annual evaluation rating an employee at the hospital could achieve. (Corbin Depo. at 256:19 - 257:13; PX 11, 12)

After the February 2013 meeting, Ms. Carpenter reduced Mr. Corbin's annual appraisal. For several years, Mr. Corbin had received "Role Model" evaluations; however, a mere two months after his disability discrimination complaint, his appraisal was reduced to "Exceeds Standards" in his 2013 evaluation. Also, as of an email from Ms. Carpenter, dated January 7, 2013, she intended to give him a Role Model evaluation. However, on June 1, 2013, a mere three months after Mr. Corbin's first discrimination complaint, Ms. Carpenter reduced that appraisal to Exceeds Standards, which resulted in a reduced bonus for Mr. Corbin. (Corbin Depo. at 180: 5 - 25; 256:19 - 257:13; PX 11, 12; DX 4)

For a short time following the meetings with Mr. Darrington, the situation between Ms. Carpenter and Mr. Corbin improved somewhat. However, by late July of 2013, Ms. Carpenter was after Mr. Corbin again. On July 31, 2013, she sent a message to Vice President Richard

Caldwell, asking him to help get rid of Mr. Corbin.  In her message, she stated "Jacob must go." (PX 20)  Ms. Carpenter also enlisted Vice President Michael Ritzus' aid in getting Mr. Corbin fired.  Mr. Ritzus provided a memorandum to Defendant's CEO, Joe Riley, complaining about the Information Technology department at Jackson Hospital. (PX 7)

On July 29, 2013, Ms. Carpenter gave Mr. Corbin a Written Warning for "Poor job performance."  (DX 6)  Mr. Corbin, Ms. Carpenter, Mr. Darrington and Vice President Richard Caldwell met to discuss the Written Warning.

Mr. Corbin prepared a discrimination complaint, dated September 19, 2013, in response to the Written Warning, which complaint accused Defendant and its agents of discriminating against him because of his disability.  (PX 6, pp. 4, 5)  He presented his complaint to Vice President for Human Resources, Gilbert Darrington.

A mere two weeks after Mr. Darrington received Mr. Corbin's response, on October 3, 2013, Mr. Darrington sent an email to Vice President Richard Caldwell, Subject: Jacob's Statement.  Darrington hand-wrote on that email message that he was "asked to hold off until Paragon go-live."  It was readily apparent that, as of October 3, 2013, only two weeks after his September 19 complaint, Defendant was planning to terminate Mr. Corbin's employment; however, it delayed the termination until the new Paragon system was brought on line, just in case Mr. Corbin was needed to assist.   (PX 21)

On November 11, 2013, Defendant's agent Gilbert Darrington gave Mr. Corbin a letter that stated his position at Jackson Hospital was being eliminated.  (PX 15; PX 16)   Kris Carpenter was asked to resign the same day as Mr. Corbin was given his notice.  (Carpenter Depo. at 37:16-22)

Mr. Darrington also gave Mr. Corbin a letter stating that he would receive severance after his position was eliminated and also that Jackson Hospital would not oppose claims for unemployment compensation benefits.   (PX 15)

Following the termination of Mr. Corbin's employment, he learned that a meeting was held with Mr. Corbin's former staff.  At the meeting, Michael James commented that Mr. Corbin and Ms. Carpenter were both removed because of a problem with Microsoft licenses, that cost the hospital over $300,000.   (Darrington Depo. at  41:3 – 42:6; PX 22 and 23 - Affidavits of Andy Johnson and Robert Nicholson)   Nothing was said to Mr. Corbin about the Microsoft licenses being a reason for the elimination of his position.

The Information Services Department's employee list showed Mr. Corbin as the Team Leader of the Infrastructure Division while he was employed by Defendant.  (PX 3)   However after his position was allegedly "eliminated," the employee list continued to show a position over the Infrastructure Team.   (PX 19)

Ms. Carpenter testified that she was aware of the Microsoft license issue before she was asked to resign. Decisions to pay for licenses were made by Mr. Peter Vandervoort, a former vice president, who was above Ms. Carpenter's pay grade.  (Carpenter Depo. at 31:15 -33:10)

Andy Johnson and Robert Nicholson were two of Mr. Corbin's subordinates, when he was  Infrastructure  Team  Lead.  Both  Johnson  and  Nicholson  complained  about  race discrimination by Mr. Michael Jones, who succeeded Kris Carpenter as the IT Director.  Within days of their complaints of discrimination, both Johnson and Nicholson were notified that their positions had been eliminated.  (PX 22 and 23)

Mr. Johnson testified that Mr. Corbin's narcolepsy was a joke around the IT department and also that Ms. Carpenter commented about how Mr. Corbin was unavailable to work after hours.  (PX 22, ¶12)

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper only "if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A party seeking Summary Judgment always bears the initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which [it] believes demonstrate the absence of a genuine issue of material fact. The moving party has the burden of demonstrating that no genuine issue as to any material fact exists, and that it is entitled to judgment as a matter of law. *Celotex Corporation v. Catrett*, 477 U.S. 317 (1986), citing, Fed. Rules Civ. Proc. Rule 56(c).   To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). On the other hand, the evidence of the non-movant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

The Court must reject any effort by a defendant to interpret the facts, as the Defendants seek in this case. It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather to decide whether issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations. *Hairston v. Gainsville Sun Publishing Co.,* 9 F. 3d 913, 919 (11th Cir. 1993); *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash*

*Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985) (emphasis added).

## III.   ARGUMENT

**A.     Mr. Corbin has established a *prima facie* case of disability discrimination under the ADA.**

In his Complaint, Mr. Corbin contends Jackson Hospital subjected him to disability discrimination when it wrongfully terminated him from his employment with Jackson Hospital. (Doc. 1).   The Americans with Disabilities Act ("ADA") prohibits discrimination against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).   To establish a *prima facie* case of discrimination under the ADA, Mr. Corbin must show: (1) he has a disability; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of the disability.   *Holly v. Clairson Indus. L.C.C.*, 492 F.3d 1247, 1255-56 (11th Cir. 2007).

Here, Mr. Corbin can prove a *prima facie* case of disability discrimination because he is a qualified individual suffering from a disability and was subjected to unlawful discrimination because of his disability when he was terminated from his employment at Jackson Hospital. Jackson Hospital is unable to articulate a legitimate, non-discriminatory reason for Mr. Corbin's termination.   Thus, Jackson Hospital's Motion for Summary Judgment as to Mr. Corbin's disability claim is due to be denied.

### i.     Mr. Corbin's narcolepsy is a disability under the ADA.

Mr. Corbin's narcolepsy is a disability as defined by the ADA.   Under the ADA, disability is defined as (a) a physical or mental impairment that substantially limits one or more major life activities of such individual; (b) a record of such an impairment; or (c) being regarded

as having such an impairment.  42 U.S.C. §12102(1).  The definition of disability shall be "construed in favor of broad coverage of individuals under this Act."  42 U.S.C. §12102(4)(A). The statute defines major life activities as including, but not limited to: "caring for oneself, performing manual tasks, seeing, hearing, eating, **sleeping**, walking, standing, lifting, bending, speaking, breathing, learning, reading, **concentrating, thinking**, communicating, and working." 42 U.S.C. §12102(2)(A), **emphasis added**.

In the present case, there is no question that Mr. Corbin's narcolepsy is a disability under the ADA.  Mr. Corbin began exhibiting symptoms of narcolepsy around November to December 2009 and was diagnosed with narcolepsy with cataplexy by his neurologist, Dr. Rubin Richardson, in 2009.  (Corbin Depo. at 34:23-35:19; PX 4, p. 2)  Mr. Corbin's narcolepsy prevents him from being able to sleep for several days at a time.  (Corbin Depo. at 123:20-22). As a result of narcolepsy, Mr. Corbin is prone to sleepiness and can experience "brain fog," where Mr. Corbin's mind is "halfway asleep."  (Corbin Depo. at 32:1-3; 125:1-19.)  In addition, Mr. Corbin has difficulty with concentration and memory.  (Corbin Depo. at 125:14-19.)  As Mr. Corbin gets sleepy, it is more difficult for him to remember things at that time, and at work he would sometimes have a "brownout" in which he would not have any memory of a certain time period.  (Corbin Depo. at 123:23-124:2). Mr. Corbin also testified his narcolepsy caused him to experience hallucinations.   (Corbin Depo. at 124:8-22).  Finally, narcolepsy is one of the conditions, for which Mr. Corbin has claimed, and has been awarded, on or about June of 2014, Social Security disability benefits.  (Corbin Depo. at 49:20-44; 51:1-10)

Because Mr. Corbin's narcolepsy limits his major life activities, such as sleeping, thinking and concentration, Mr. Corbin's narcolepsy is considered a disability under the ADA. Thus, Mr. Corbin satisfies the first prong of a *prima facie* case of disability discrimination.

      **ii.**     **Mr. Corbin is a qualified individual.**

Mr. Corbin is a qualified individual under the ADA.  The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.  42 U.S.C. §12102(8).  To be "qualified," a person must be "able to meet all of a program's requirements in spite of his handicap." *Jackson v. Boise Cascade Corp.*, 941 F. Supp. 1122, 1126 (S.D. Ala 1999)(citing *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 60 L. Ed. 2d 980, 99 S. Ct. 2361 (1979).

In the present case, Mr. Corbin is a qualified individual because he was able to perform the essential functions of his job as an Infrastructure Team Leader at Jackson Hospital.  Mr. Corbin was diagnosed with narcolepsy with cataplexy by his neurologist, Dr. Rubin Richardson, in 2009.  (Corbin Depo. at 34:23-35, ln 19; PX 4, p. 2)  Mr. Corbin reported this diagnosis to Ms. Carpenter.    (Corbin Depo. at 129:4-11; Carpenter Depo at 19:13-20:6)  Notwithstanding his narcolepsy, Mr. Corbin was able to perform the essential functions of his position as a Infrastructure Team Leader within Jackson Hospital's IT Department. Pursuant to Jackson Hospital's evaluation policy, "Role Model" was the highest possible annual evaluation rating an employee at the hospital could achieve.  (Corbin Depo. at 256:19 – 257:13; PX 11, 12)  During his tenure with Jackson Hospital, Mr. Corbin was considered a "Role Model" employee on all evaluations, except for his last one, dated June 1, 2013.  Mr. Corbin testified:

> "[My supervisor] had never given me anything but a role model [rating] the entire time she evaluated me.  And I believe that my previous supervisor had also only given me role model evaluations."

(Corbin Depo. at 257:3-10).

In 2013, Mr. Corbin was evaluated as "Exceeds Standards," or the second highest on a four category scale of ratings.  (Corbin Depo at. 179:13-15; PX 11, 12).  While this rating was lower than Mr. Corbin's previous "Role Model" status, the "Exceeds Standards" rating remains a positive performance review rating and also means that Defendant believed that he could perform his job as Infrastructure Team Leader.

 Mr. Corbin is considered a qualified individual because he was able to perform the necessary and essential functions of the Infrastructure Team Leader position, regardless of his narcolepsy diagnosis. Thus, Mr. Corbin has satisfied the second prong of a *prima facie* case of disability discrimination.

### iii.      Corbin was subjected to unlawful discrimination because of his narcolepsy.

After informing Jackson Hospital of his narcolepsy diagnosis, Mr. Corbin was subjected to unlawful discrimination, based on his disability, by Jackson Hospital and its agents.  Under the ADA, an employer may not discriminate against "a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees." 42 U.S.C. § 12112(a).  The term 'discriminate' includes: "limiting, segregating, or classifying [an employee] in a way that adversely affects the opportunities or status of such [employee] because of the [employee's disability].  42 U.S.C. § 12112(b)(1).

In the present case, once Jackson Hospital and its agents were notified of Mr. Corbin's disability, they began subjecting him to disparate treatment.  Mr. Corbin testified that, initially, he got along well with his supervisor, Ms. Kris Carpenter:

> "[After she became director] we actually became better friends than we had ever been.  She would confide in me family problems and personal problems, and I would try to give her advice on it. We, just the two of us at times, would go on business trips with each other.  And during those, a lot of it was not just going to the

> business functions, we would go out for a dinner cruise together, or
> something like that."

(Corbin Depo. at 115:6-18).

A day or two after his narcolepsy diagnosis, Mr. Corbin informed Ms. Carpenter of his diagnosis. (Corbin Depo. at 129:1-16.) Shortly thereafter, Ms. Carpenter began subjecting Mr. Corbin to disparate treatment. In the next monthly department meeting, Ms. Carpenter pressured Mr. Corbin to stand up in a department meeting and explain his condition. (Corbin Depo. at 173:7-17.) Mr. Carpenter also told a vendor representative that Mr. Corbin was diagnosed with narcolepsy and would not be available in the early morning or late at night. (Corbin 177:2-23.) Mr. Corbin was also subjected to ridicule and joking because of his narcolepsy. (Ivery Depo. at 19:1-23) Mr. Andy Johnson testified that Mr. Corbin's narcolepsy was a joke around the IT department. (PX 22, ¶12)

Although Mr. Corbin was not obligated to work in an on-call capacity, prior to developing narcolepsy, Mr. Corbin would come in to work in an on-call capacity if the need arose. (Corbin Depo. at 146:1-6.) However, after developing narcolepsy, Mr. Corbin was unable to come into work in an on-call capacity because of his symptoms. (*Id.* at 146:6-8.) This caused Ms. Carpenter to grow resentful towards Mr. Corbin, and as a result, Ms. Carpenter attempted to change Mr. Corbin's job description in an attempt to make Mr. Corbin no longer qualified for his position because of his narcolepsy. (*Id.* at 146:8-9; 256:9-13). Mr. Corbin testified:

> "[M]s. Carpenter wanted to change [my job description] to where I
> would be mandatorily on call, and she wanted to change it to
> where I had to come into work earlier, and both of those [changes]
> would have either – well, one would have been impossible with my
> medication for my condition, and the other one would be difficult."

(Corbin Depo. at 135:13-25).

On February 11, 2013, Mr. Corbin complained about this attempt by Ms. Carpenter to change his work hours, as discriminatory against him for his disability.  (Corbin Depo. at 136–137:6; PX 5)   Gilbert Darrington, Jackson Hospital's Human Resources Officer, met with Ms. Carpenter and Mr. Corbin, on February 18, 2013, to discuss Mr. Corbin's complaint.   Mr. Darrington did not allow Ms. Carpenter to change Mr. Corbin's schedule.  (Corbin Depo. at 160:8-17; DX 2)  Also, as of an email from Ms. Carpenter, dated January 7, 2013, she intended to give him a Role Model evaluation. (DX 4, p. 2) However, on June 1, 2013, she reduced that appraisal to Exceeds Standards; this evaluation resulted in a reduced bonus for Mr. Corbin. (Corbin Depo. at 180; 256:19 - 257:13; PX 11, 12)

By late July of 2013, Ms. Carpenter was after Mr. Corbin again.  On July 31, 2013, she sent a message to Vice President Richard Caldwell asking him to help get rid of Mr. Corbin.  In her message, she stated "Jacob must go."   (PX 20) Ms. Carpenter also enlisted Michael Ritzus' aid getting Mr. Corbin fired.  Mr. Ritzus provided a memorandum to Defendant's CEO, Joe Riley, complaining about the Information Technology department at Jackson Hospital. (PX 7)

After Mr. Corbin had just received an "Exceeds Standards" evaluation dated June 1, 2013, on July 29, 2013, Ms. Carpenter gave Mr. Corbin a Written Warning about his "Poor job performance."   (PX 12, DX 6)  Mr. Corbin prepared a response, dated September 19, 2013, to the Written Warning which accused Defendant and its agents of discriminating against him because of his disability.  (PX 6, pp. 4, 5)  A mere two weeks after Mr. Darrington received Mr. Corbin's response, on October 3, 2013, Mr. Darrington sent an email to Vice President Richard Caldwell, Subject: Jacob's Statement.  Mr. Darrington hand-wrote on that email message that he was "asked to hold off until Paragon go-live."  It was readily apparent that Defendant, as of October 3, 2013, was planning to terminate Mr. Corbin's employment; however, it delayed the

termination until the new Paragon system was brought on line, just in case Mr. Corbin was needed to assist.   (PX 21)

On November 11, 2013, Defendant's Vice President Gilbert Darrington gave Mr. Corbin a letter that stated his position at Jackson Hospital was being eliminated.   (PX 15; PX 16) However, Kris Carpenter, Mr. Corbin's supervisor, was asked to resign the same day as Mr. Corbin was given his notice, instead of receiving notice that her position was being eliminated. (Carpenter Depo. at 37:16-22)

Mr. Corbin was repeatedly harassed, ridiculed, singled out, and ultimately terminated because of his disability of narcolepsy.  As a result, Mr. Corbin has satisfied the third prong of a *prima facie* case.

### iv.   Jackson Hospital's proffered reason for Mr. Corbin's termination was pretextual.

Jackson Hospital is unable to offer a legitimate, non-discriminatory reason for Mr. Corbin's termination.  To show pretext, the plaintiff must demonstrate that the proffered reason was not the true reason for the employment decision by showing such inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could find the legitimate reason unworthy of credence. *See Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010)(citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). A plaintiff will survive summary judgment by "producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." *Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir. 1994)(citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993));  *see also Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 921(11th Cir. 1993)( stating "[t]he burden to avoid summary judgment is not to show by a preponderance of the evidence that the

state reasons were pretext.  Rather, plaintiff's burden … is met by introducing evidence that … could allow a jury to find … that the plaintiff has established pretext, and that the action was taken in retaliation for engaging in the protected activity.") To satisfy this threshold showing of pretext, a plaintiff may discredit the employer's proffered legitimate reasons by showing (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employment decision, or (3) that they were insufficient to motivate the employment decision. *Walker v. NationsBank N.A.*, 53 F.3d 1548, 1564 (11th Cir. 1995)(citing *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994); *McNabola v. Chicago Transit Authority,* 10 F.3d 501 (7th Cir. 1993)).

In the present case, Mr. Corbin is able to provide sufficient evidence to suggest that Jackson Hospital decision to terminate him was motivated by his disability.  First, Jackson Hospital states it terminated Mr. Corbin in response to "JTT's Network Assessment and the results of Microsoft's official software audit."  (Doc. 28, pg. 7.)  However, in its November 11, 2013, separation letter to Mr. Corbin, Jackson Hospital only informs Mr. Corbin it "deem[s] it necessary to eliminate [Corbin's] position."  (PX 15) The letter does not specify, or even allude to, the network assessment or software audit as the reason for Mr. Corbin's termination.  *Id.*

Further, although following the termination, Michael James commented that Mr. Corbin and Ms. Carpenter were both removed because of a problem with Microsoft licenses, that cost the hospital over $300,000, Ms. Carpenter testified that decisions to pay for licenses were made by  a former vice president, Mr. Peter Vandervoort,. (*See* Darrington Depo. at 41:3 – 42:6; PX 22 and 23 - Affidavits of Andy Johnson and Robert Nicholson; *see also* Carpenter Depo. at 31:15 - 33:10).  Therefore, Mr. Corbin, a subordinate to Ms. Carpenter, would have had no influence over Jackson Hospital's decision to pay over $300,000 for licenses.

Jackson Hospital's decision to ask Ms. Carpenter to resign the same day as Mr. Corbin was given his notice supports Mr. Corbin's claim that he was subjected to disparate treatment. (Carpenter Depo. at 37:16-22).  Even though Mr. James stated that both Mr. Corbin and Ms. Carpenter were removed because of the licensure issue, Ms. Carpenter was treated more favorably when Jackson Hospital asked her to resign.  On the other hand, Mr. Corbin was informed that his position was being eliminated.

Finally, Mr. Corbin's termination is not the only termination by Jackson Hospital that occurred after an employee complained of discrimination.  Jackson Hospital employees Andy Johnson and Robert Nicholson complained about race discrimination by Mr. Michael Jones, who succeeded Kris Carpenter as the IT Director.  Within days of their complaints of discrimination, both Johnson and Nicholson were notified that their positions had been eliminated.  (PX 22 and 23)

Based on the foregoing, a reasonable finder of fact could come to the conclusion that Jackson Hospital's proffered reason for Mr. Corbin's termination is pretextual, and that the real reason for Mr. Corbin's termination was his disability.  By terminating Mr. Corbin from his employment, Jackson Hospital subjected Mr. Corbin to illegal disability discrimination. Therefore, Jackson Hospital's Motion for Summary Judgment as to Mr. Corbin's disability claim is due to be denied.

**B.      Mr. Corbin has established a *prima facie* case of retaliation under the ADA.**

In his Complaint, Mr. Corbin contends Jackson Hospital subjected him to illegal retaliation.  To establish a *prima facie* case of retaliation, Mr. Corbin must show he was (1) engaged in a statutorily protective activity, (2) was subjected to a materially adverse action, and (3) establish a causal link between the protected activity and the adverse action.  *Goldsmith v.*

*Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008)(citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

Here, Mr. Corbin establishes a *prima facie* case of retaliation under the ADA because he was terminated by Jackson Hospital less than two months after he made multiple complaints to Jackson Hospital's Vice President for Human Resources, Gilbert Darrington, about being subjected to disability discrimination.  Jackson Hospital is unable to articulate a legitimate, non-discriminatory reason for Mr. Corbin's termination, leading a reasonable fact finder to conclude that Mr. Corbin suffered retaliation when Jackson Hospital eliminated his employment with the Hospital.  Thus, Jackson Hospital's Motion for Summary Judgment as to Mr. Corbin's retaliation claim is due to be denied.

      **i.     Mr. Corbin engaged in statutorily protected activity.**

Mr. Corbin engaged in a statutorily protected activity when he complained to Jackson Hospital Human Resources that he was being subjected to discrimination.  Statutorily protected activities include complaints to supervisors about illegal discrimination. *See Shannon v. BellSouth Telecomms., Inc*., 292 F.3d 712, 715 n.2 (11th Cir. 2002)("Title VII protects not just 'individuals who have filed formal complaints,' but also those 'who informally voice complaints to their superiors or who use their employers' internal grievance procedures.'")(quoting *Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 399 (11th Cir. 1989)).[1]  In the instant case, on or about February 11, 2013, Mr. Corbin filed a complaint with Gilbert Darrington, Jackson Hospital Human Resources Officer, regarding disability discrimination he was

---

[1] The ADA provides that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge … under [the ADA]." 42 U.S.C. § 12203(a).  This provision creates a prohibition on retaliation under the ADA that is similar to Title VII's prohibition on retaliation. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 161 F.3d 1278 (11th Cir. 1998).  Accordingly, the Eleventh Circuit assesses ADA retaliation claims under the same framework employed for retaliation claims arising under Title VII. *Id. at* 1287 (citing *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1075-77 (11th Cir. 1996)).

experiencing on the job.  (Corbin Depo. at 136:8 - 137:6; PX 5)   On February 18, 2013, Mr.

Darrington met with Mr. Corbin and Ms. Carpenter to discuss Mr. Corbin's complaint.  (Corbin

Depo. at 160:8-17; DX 1, 2)  Several months later, on or about September 19, 2013, Mr. Corbin

delivered a written complaint of disability discrimination to Mr. Darrington.  (PX 6, pp. 4, 5)

Mr. Corbin engaged in a statutorily protected activity when he made complaints to

Jackson Hospital Human Resources regarding his belief that he was being discriminated on the

basis of his disability.  Thus, Mr. Corbin satisfies the first prong of a *prima facie* case of

retaliation discrimination.

### ii.    Jackson Hospital's termination of Mr. Corbin was an Adverse Action.

Mr. Corbin was subjected to an adverse action when Jackson Hospital terminated him

from his position as Infrastructure Team Leader within Jackson Hospital's IT Department. In the

context of a retaliation claim, an adverse employment action is a materially adverse action, such

that the action "could well dissuade a reasonable worker from making or supporting a charge of

discrimination." *Childrey v. CGI Techs. & Sols.*, 2018 U.S. Dist. LEXIS 51627, at *8 (M.D. Ala.

Mar. 28, 2018)( (quoting *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 76, 126 S.

Ct. 2405, 165 L. Ed. 2d 345 (2006)). The asserted impact must be "serious and material," such

that it is "materially adverse as viewed by a reasonable person in the circumstances." *Id.* at *8

(citing *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001)). "*Burlington* ...

strongly suggests that it is for a jury to decide whether anything more than the most petty and

trivial actions against an employee should be considered 'materially adverse' to him and thus

constitute adverse employment actions." *Id.* at *8 (citing *Crawford v. Carroll*, 529 F.3d 961, 973

n.13 (11th Cir. 2008)).

On November 11, 2013, Defendant's agent Gilbert Darrington gave Mr. Corbin a letter that stated his position at Jackson Hospital was being eliminated. (PX 15; PX 16) As a result, Mr. Corbin's employment with Jackson Hospital ended. A reasonable person can conclude Jackson Hospital's decision to terminate Mr. Corbin was materially adverse and that the impact of the termination was serious and material because Corbin lost his source of income. Therefore, Mr. Corbin's termination from his employment with Jackson Hospital was an adverse employment action.

### iii.   A Causal Nexus Exists between Mr. Corbin's Complaint of Discrimination and Jackson Hospital's Decision to Terminate Corbin.

Mr. Corbin was subjected to unlawful retaliation when Jackson Hospital terminated him after he complained about discrimination. The requirement of a causal link in a retaliation case is to be "interpreted broadly," meaning the plaintiff "merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Gary v. Hale*, 212 Fed. Appx. 952, 957 (11th Cir. 2007)(citing *Meeks v. Computer Assocs.*, 15 F.3d. 1013, 1021 (11th Cir. 1994)). This burden "can be met by showing close temporal proximity between the statutorily protective activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). More importantly, the Eleventh Circuit has repeatedly indicated that a plaintiff may satisfy the causal link in a retaliation case by establishing that "the employer was actually aware of the protected expression at the time it took the adverse employment action." *Clover v. Total Sys. Serv, Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999); *Raney v. Vinson Guard Serv.*, 120 F.3d 1192, 1197 (11th Cir. 1997); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). That is, the causation threshold may be satisfied if it can be shown "that the person taking the adverse action was aware of the protected expression." *Bass v. Bd. of County Commr's of Orange County, Fla.*, 256 F.3d 1095, 1119 (11th

Cir. 2001). Such awareness may be established either by direct evidence, or by circumstantial evidence, such as proximity in time. *Clover*, 176 F.3d at 1354; *Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926, 934 (11th Cir. 1995).

In *Hale*, 212 Fed. Appx. 952, an employee was denied a promotion during two rounds of promotions, despite the fact that she passed the sergeant's exam.  The employee alleged that she was denied the promotions because she had filed numerous grievances and charges of discrimination, the earliest of which was lodged twenty-three (23) years before the first round of promotions and the most recent of which was lodged eight (8) months before the second round of promotions. *Id.* at 954-955. On review, the Eleventh Circuit stated that the plaintiff met the causation threshold for purposes of a *prima facie* case of retaliation when she established, via direct evidence, that the promotional review committee were actually aware of the plaintiff's earlier complaints of discrimination when the committee made their adverse employment decision.  *Id.* at 957.

On or about February 11, 2013, Mr. Corbin filed his first complaint with Mr. Darrington, regarding disability discrimination he was experiencing on the job.  Mr. Darrington met with Mr. Corbin to discuss the complaint on or about February 18, 2013.  (Corbin Depo. at 136:8 - 137:6; PX 5)   Mr. Darrington met with Mr. Corbin on February 18, 2013 to discuss Corbin's complaint. After receiving a written warning in July 2013, Mr. Corbin prepared a discrimination complaint, in response to the written warning, in which he accused Jackson Hospital and its agents of discriminating against him because of his disability.  (PX 6, pp. 4, 5)  Mr. Corbin presented the response to Mr. Darrington on September 19, 2013.  *Id.*  A mere two weeks after Mr. Darrington received Mr. Corbin's response, on October 3, 2013, Mr. Darrington sent an email to Vice President Richard Caldwell, Subject: Jacob's Statement.  Mr. Darrington hand-

wrote on that email message that he was "asked to hold off until Paragon go-live." (PX 21) Then, on November 11, 2013, Mr. Darrington presented the "Severance" letter to Mr. Corbin. (PX 15)

Like the plaintiff in *Hale*, Mr. Corbin has provided direct evidence that Jackson Hospital, and more specifically, Human Resource Officer Gilbert Darrington who signed Corbin's termination letter, was aware of his earlier complaints of discrimination when it made the decision to terminate Mr. Corbin's employment. (PX 15; PX 16)  However, Mr. Corbin's final complaint of discrimination was lodged less than two (2) months before his termination; making a substantially less period of time between his final complaint of discrimination and later termination than the eight (8) month period of time between the *Hale* plaintiff's last complaint and her denial of a promotion.

### iv.     Jackson Hospital cannot articulate a legitimate, non-discriminatory reason for Mr. Corbin's termination that does not include retaliation.

Mr. Corbin is able to present evidence of significant issues of material fact that could lead a jury to conclude that Jackson Hospital's decision to "eliminate" Mr. Corbin's position is pretextual, and the actual reason for the elimination was on the basis of retaliation.  If the employee establishes a *prima facie* case of retaliation, then the burden shifts to the employer to produce legitimate reasons for the adverse employment action. *Green v. Mobis*, 995 F.Supp. 2d 1285, 1306-1307 (11th Cir. 2014)(citing *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 (11th Cir. 2001)).  If the employer does so, the employee must show that the reasons given by the employer are pretextual. *Id.*  Further, the Eleventh Circuit states:

> "Disbelief of the defendant's proffered reasons, together with the *prima facie* case, is sufficient circumstantial evidence to support a finding of discrimination.  Therefore, … a plaintiff is entitled to survive summary judgment, … if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth

20

> of each of the employer's proffered reasons for its challenged
> action."

*Farley v. Nationwide Mut. Ins. Co*., 197 F.3d 1322, 1337 (11th Cir. 1999)(*citing Combs v.*

*Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997).

Here, Mr. Corbin has established a *prima facie* case of retaliation and there is ample evidence to create a genuine issue of fact with respect to Jackson Hospital's proffered reason for Mr. Corbin's termination.  First, Jackson Hospital states it terminated Mr. Corbin in response to "JTT's Network Assessment and the results of Microsoft's official software audit."  (Doc. 28, pg. 7)  However, in its November 11, 2013, separation letter to Mr. Corbin, Jackson Hospital only informs Mr. Corbin it "deem[s] it necessary to eliminate [Corbin's] position."  (PX 15)  The letter does not specify, or even allude to, the network assessment or software audit as the reason for Mr. Corbin's termination.  *See Id.*

Further, a mere two weeks after Mr. Darrington received Mr. Corbin's response, on October 3, 2013, Mr. Darrington sent an email to Vice President Richard Caldwell, Subject: Jacob's Statement.  Mr. Darrington hand-wrote on that email message that he was "asked to hold off until Paragon go-live."   As of October 3, 2013, Defendant was planning to terminate Mr. Corbin's employment; however, it delayed the termination until the new Paragon system was brought on line, just in case Mr. Corbin was needed to assist.   (PX 21)

Following the termination of Mr. Corbin's employment, Michael James informed Corbin's staff that Mr. Corbin and Ms. Carpenter were both removed because of a problem with Microsoft licenses that cost the hospital over $300,000.  (Darrington Depo. at  41:3 – 42:6; PX 22 and 23 - Affidavits of Andy Johnson and Robert Nicholson)  This reason was completely different from the earlier stated reason for Mr. Corbin's termination.  (PX 15)

Ms. Carpenter testified that decisions to pay for licenses were made by Mr. Peter Vandervoort, a former vice president. (*See* Darrington Depo. at 41:3 – 42:6; PX 22 and 23 - Affidavits of Andy Johnson and Robert Nicholson; *see also* Carpenter Depo. at 31:15 -33:10). Therefore, Mr. Corbin, a subordinate to Ms. Carpenter, would have had no influence over Jackson Hospital's decision to pay over $300,000 for licenses in the first place, and Mr. James' stated reason for Corbin's termination was pretextual.

Further, it is unlikely Jackson Hospital would have offered a severance package, complete with compensation, benefits and payment for unused leave, to Mr. Corbin if he really cost them $300,000 in license fees.

Interestingly, Jackson Hospital's decision to ask Ms. Carpenter to resign the same day as Mr. Corbin was given his notice supports Mr. Corbin's claim that he was subjected to disparate treatment. (Carpenter Depo. at 37:16-22). Even though Mr. James stated that both Mr. Corbin and Ms. Carpenter were removed because of the licensure issue, Ms. Carpenter was treated more favorably when Jackson Hospital asked her to resign. On the other hand, Mr. Corbin was informed that his position was being eliminated.

Further, the Information Services Department's employee list showed Mr. Corbin as the Team Leader of the Infrastructure Division while he was employed by Defendant. (PX 3) However after his position was allegedly "eliminated," the employee list continued to show a position over the Infrastructure Team. (PX 19) Apparently, Mr. Corbin's position was not eliminated, as Mr. Darrington stated in his November 11, 2013 "Severance" letter to Mr. Corbin. (PX 15)

Finally, Mr. Corbin's termination is not the only termination by Jackson Hospital that occurred soon after an employee complained of discrimination. Jackson Hospital employees

Andy Johnson and Robert Nicholson complained about race discrimination by Mr. Michael Jones, who succeeded Kris Carpenter as the IT Director.  Within days of their complaints of discrimination, both Johnson and Nicholson were notified that their positions had been eliminated.  (PX 22 and 23)

Jackson Hospital's proffered reason for Mr. Corbin's termination is pretextual.  Based on the foregoing, a reasonable fact finder can conclude that Mr. Corbin was subjected to disability discrimination and retaliation when Jackson Hospital eliminated Mr. Corbin's employment. Therefore, Jackson Hospital's Motion for Summary Judgment as to Mr. Corbin's retaliation claim is due to be denied.

## IV.  CONCLUSION

Mr. Corbin has provided ample evidence to establish significant issues of material facts in this matter.  Mr. Corbin has established a *prima facie* case of disability discrimination and offered evidence that Jackson Hospital's proffered reasons for its actions are pretextual.  In addition, Mr. Corbin has established a *prima facie* case of retaliation because he was terminated shortly after he made complaints to Jackson Hospital Human Resources about being subjected to illegal discrimination.   Jackson Hospital's stated reason for Mr. Corbin's termination is pretextual, and it is unable to offer a legitimate, non-retaliatory reason for Mr. Corbin's termination.  Based on the foregoing, a reasonable fact finder can conclude that Mr. Corbin was subjected to disability discrimination and retaliation when Jackson Hospital eliminated his employment with the Hospital. Therefore, Mr. Corbin moves this Court to enter an Order denying Jackson Hospital's Motion for Summary Judgment.

Respectfully submitted this the 3rd day of May, 2018.

   /s/ Chase Estes_____
Joseph C. Guillot (ASB-4581-035J)
Chase Estes (ASB-1089-F44L)
Attorneys for the Plaintiff

**OF COUNSEL:**
**MCPHILLIPS SHINBAUM, L.L.P.**
516 S. Perry Street
Montgomery, AL 36104
Telephone: (334) 262-1911
Fax: (334) 263-2321
joeglaw5@gmail.com
cestes@msg-lawfirm.com

## CERTIFICATE OF SERVICE

     I hereby certify that on this the 3rd day of May 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF filling system, which will electronically serve a copy of the same to the following counsel of record:

Ben C. Wilson
Amanda C. Hines
Ruston Stakely, Johnston & Garrett, PA
184 Commerce Street
Montgomery, AL 36101
bew@rushtonstakely.com
ach@rushtonstakely.com

   /s/ Chase Estes_____
OF COUNSEL