IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JACOB CORBIN,                    )
                                 )
        Plaintiff,               )
                                 )
v.                               )        CASE NO.: 2:16-cv-800-SRW
                                 )
JACKSON HOSPITAL & CLINIC,       )
INC.,                            )
                                 )
        Defendant.               )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Jacob Corbin brings this action against defendant Jackson Hospital &
Clinic, Inc. ("Jackson"), alleging disability discrimination and retaliation pursuant to the
Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"), as amended by
the ADA Amendments Act (the "ADAAA"), and the Rehabilitation Act, 29 U.S.C. § 701
*et seq.* (the "RA"). *See* Doc. 1.[2] Jackson is a healthcare provider and hospital located in
Montgomery County, Alabama. Corbin was hired by the defendant in 2002 and fired in
November of 2013. During his employment, Corbin reached the position of "team leader"
within the defendant's Information Technology ("IT") department. Plaintiff held the team
leader job title until his termination. This lawsuit concerns allegations of discrimination

---

[1] The parties consented to final dispositive jurisdiction by a Magistrate Judge pursuant to 28 U.S.C.
§ 636(c). *See* Doc. 16; Doc. 17.

[2] References herein to "Doc. __" are to the document numbers assigned to the pleadings, motions,
and other materials, as reflected on the docket.

related to plaintiff's purported disability, as well as allegations that the defendant retaliated against Corbin due to that disability.

This cause is presently before the court on defendant's motion for summary judgment. *See* Doc. 27. Plaintiff filed a response in opposition to the motion, *see* Doc. 47, and Jackson replied, *see* Doc. 48. Upon review of the motion and the record, the court concludes that defendant's motion for summary judgment is due to be granted.

## SUMMARY JUDGMENT STANDARD

A movant is entitled to summary judgment if he "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For summary judgment purposes, an issue of fact is "material" if, under the substantive law governing the claim, its presence or absence might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the movant fails to satisfy its initial burden, the motion for summary judgment will be denied. *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012). If the movant adequately supports its motion, the burden shifts to the opposing party to establish – "by producing affidavits or other relevant and admissible evidence beyond the pleadings" – specific facts raising a genuine issue for trial. *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011); *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010); Fed. R. Civ. P. 56(c)(1)(A). "All affidavits [and declarations] must be based on personal knowledge and must set forth facts that would be admissible under the Federal Rules of Evidence[.]" *Josendis*, F.3d at 1315; Fed. R. Civ. P. 56(c)(4).

The court views the evidence and all reasonable factual inferences in the light most favorable to the nonmovant. *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1316 (11th Cir. 2012); Fed. R. Civ. P. 56(c)(4). However, "[i]f no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) (citation omitted) (internal quotation marks omitted).

## BACKGROUND AND RELEVANT FACTS[3]

### I.     Plaintiff's Employment at Jackson

Jackson's IT department maintained the hospital's computer systems, including its internet networks, telephone systems, and other electronic and cyber resources. *See* Doc. 47-19 at 2. The IT department was managed by a director, who was responsible for three teams within the department: the financial team, the clinical team, and the infrastructure team. *Id.* The infrastructure team oversaw the hospital's networks, telephones, and internet connectivity. *Id.* Until early November of 2013, a "team leader" supervised each of the three teams. *Id.*

---

[3] As is required, the court has viewed the evidence presented on the motion for summary judgment in the light most favorable to the plaintiff. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992). These are the facts for summary judgment purposes only. They may or may not be the actual facts that could be proven at trial. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.") (citation and marks omitted). Also, the facts set out herein are derived from the parties' evidentiary submissions and the court's own examination of the record; they are not taken from counsels' unsubstantiated statements in the parties' briefs. "Statements by counsel in briefs are not evidence." *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1336 (5th Cir. 1980). *See also Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit).

Jacob Corbin began working at Jackson in 2002, and ultimately obtained the position of infrastructure team leader. *See* Doc. 1 at 2. In this position, Corbin's responsibilities included duties having to do with the hospital's technological infrastructure. *See* Doc. 47-19 at 2. During at least some of Corbin's time as infrastructure team leader, Kris Carpenter was the director of the IT department and Corbin's supervisor. *See* Doc. 47-1 at 9. In September of 2013, the defendant hired Michael James to be the new Vice President ("VP") and Chief Operating Officer ("COO"). *See* Doc. 47-19 at 1. In this role, James was responsible for the oversight and maintenance of the Hospital's IT systems. *Id.* at 2.

## II. Plaintiff's Diagnosis

In 2010,[4] Corbin was diagnosed with narcolepsy with cataplexy by Dr. Rubin Richardson. *See* Doc. 47-1 at 16. Corbin avers that, shortly thereafter, he notified Carpenter of this diagnosis. *Id.* at 16. Corbin attests that the narcolepsy with cataplexy caused him increased sleepiness and memory loss. *Id.* at 3-4.

Following this diagnosis, Corbin says that he felt pressured by Carpenter to explain his condition publicly at a department meeting. *Id.* at 22. Moreover, Carpenter notified a vendor that Corbin would not be available in the early morning or late at night due to his narcolepsy. *Id.* at 23. Also, Samantha Ivery claimed to have once heard someone at work make a joke about narcolepsy during her time as a member of Jackson's IT department; Ivery, however, could not recall any specifics regarding the joke, including which

---

[4] The year 2009 is also cited in the record. *See* Doc. 47-1 at 5.

employees may have been involved or who it may have been about. *See* Doc. 47-4 at 2. Similarly, Andy Johnson, a former member of Jackson's IT department, claimed that Corbin's "narcolepsy was a joke in the IT department," but did not elaborate with specific details. *See* Doc. 47-17 at 3.

### III.    Plaintiff's Complaints

On February 11, 2013, Corbin submitted his first internal complaint alleging that Carpenter was discriminating against him based on a disability. *See* Doc. 47-20. Corbin says that Carpenter's hostility towards him, and Carpenter's attempt to change his job description, prompted him to file this initial complaint. *See* Doc. 47-1 at 26. As part of his complaint, Corbin alleged, among other things, that Carpenter "does not communicate effective[ly]," that Carpenter yells at him, that Carpenter gives him a "hard time about accommodating his disability," and that she "criticizes his team in front of other directors." *See* Doc. 47-21. In order to investigate and address this complaint, Gilbert Darrington, Jackson's Director of Human Resources, met with Carpenter and Corbin on February 18, 2013. *Id.* At this meeting, Carpenter agreed to accommodate Corbin's disability and to meet with the staff in order to address any rumors involving Corbin. *Id.* Darrington also advised Carpenter that she could not alter Corbin's job description "after the fact" given that there was no business reason for the change and "because [Corbin] had a disability that prevented [him] from filling that position." *See* Doc. 47-1 at 21. Notably, Corbin testified that he does not believe that he "ever requested any type of accommodation" for his narcolepsy. Doc. 27 at 15.

## IV.    Plaintiff's Job Performance

Most of the time, Carpenter designated Corbin a "role model" employee. *See* Doc. 47-1 at 27. The "role model" distinction was the highest category that an employee could receive as part of an evaluation. *Id.* at 25. Further, an employee's pay was influenced by the evaluations; in other words, the higher the evaluation, the higher the pay increase for the year. *Id.*

Corbin characterizes the June 2013 evaluation—during which he was assessed as "exceed[ing] standards," one level below "role model" status—as retaliation on the part of Carpenter due to Corbin's complaints. *Id.* at 25. However, according to Carpenter, Corbin's February 2013 complaint did not factor into her evaluation of him. *See* Doc. 27 at 79. Also, Carpenter avers that she was directed to adjust her department's evaluations in order to decrease the amount in raises its members would receive for the year. *Id.* at 75.

Michael Ritzus, Jackson's VP of outpatient services, had a number of work-related interactions with Corbin. *See* Doc. 27 at 47. Ritzus describes Corbin's behavior as unprofessional and his work as negligent, and he shared these thoughts with Carpenter. *Id.* at 53. On July 29, 2013, Ritzus became so frustrated with the IT department, and with Corbin, that he drafted a memorandum detailing the issues. *See* Doc. 47-9 at 1. Corbin was also issued a written warning setting out complaints made against him due to his "[p]oor job performance." Doc. 47-9 at 2-3. On September 19, 2013, after receiving this written warning, Corbin responded with a lengthy complaint describing his interactions with Carpenter, among others, and the alleged discrimination that he suffered due to his disability. *See* Doc. 47-8.

When the situation did not improve, Ritzus took his complaint to Joe Riley, Jackson's Chief Executive Officer ("CEO"). *See* Doc. 27 at 54. Based on conversations between Ritzus and Riley, it became clear to Ritzus that Jackson's IT department was not performing well, and its struggles were having an adverse effect on the hospital's objectives. *Id.* at 54-56. Due to the IT department's issues, Riley, Jackson's CEO, hired Jackson Thornton Technologies ("JTT"), an external IT consulting firm, to perform an audit of the department and to make recommendations to improve its performance. *See* Doc. 47-19 at 2.

## V.    JTT's Audit and the Microsoft Licenses

When he became Jackson's new VP and COO, James was presented with JTT's final report. *See* Doc. 47-19 at 3. The JTT report underscored significant problems within the IT department's infrastructure team, particularly with Corbin's reported poor management. *Id.* In order to address JTT's findings and recommendations, Riley and James discussed restructuring the IT department and its management. *Id.*

While JTT conducted its review, Microsoft conducted a software audit. *Id.* The IT department and its leadership team, Carpenter and Corbin, were responsible for maintaining software licensing. *See* Doc. 48 at 15-16. As part of its report, JTT warned that Microsoft imposes significant financial penalties on companies whose software licenses are not in compliance. *See* Doc. 47-19 at 3. In October of 2013, Microsoft determined that Jackson was not in compliance and, as a result, asked for payment of over $300,000.00. *Id.*

## VI.    Plaintiff's Termination

On November 11, 2013, Darrington informed Corbin by letter that Jackson had eliminated his position and that his employment was terminated. *See* Doc. 47-12; *see also* Doc. 47-13. Darrington avers that he was present at a subsequent meeting where the issue with the Microsoft licenses was cited, at least in part, as the reason for the removal of both Carpenter and Corbin. *See* Doc. 47-2 at 3. Riley, the CEO, and James, the COO, decided to allow Carpenter to resign and to eliminate Corbin's position. *See* Doc. 47-19 at 3-4. Riley and James made this decision in response to the JTT report and the Microsoft software audit. *Id.* at 3-4. Corbin's position, Infrastructure Team Leader, was never again opened or filled. *Id.* at 4.

## VII.    Plaintiff's Lawsuit Against Jackson

In September of 2016, Plaintiff filed this lawsuit.[5] The complaint contains the following claims of violation of the ADA and the RA against Jackson[6]: (1) wrongful termination, (2) denial of reasonable accommodation, (3) retaliatory hostile work environment, and (4) *prima facie* retaliation.[7] The court will address each claim in turn.

---

[5] Pursuant to a joint stipulation filed by the parties, *see* Doc. 41, the court dismissed with prejudice all claims asserted in the complaint, Doc. 1, by Andy Johnson. *See* Doc. 43.

[6] Corbin has brought his claims under both the ADA and the RA. As a general proposition, the same legal standards govern both statutes, and decisional authority applying one or the other may be used interchangeably. *See Allmond v. Akal Sec., Inc.*, 558 F.3d 1312, 1316 n.3 (11th Cir. 2009) ("Because the same standards govern discrimination claims under the Rehabilitation Act and the ADA, we discuss those claims together and rely on cases construing those statutes interchangeably.").

[7] The plaintiff does not appear to make a claim in the complaint for disparate treatment discrimination under the ADA. *See* Doc. 1. The plaintiff attempts to assert an ADA claim for disparate treatment in his brief in opposition to the motion for summary judgment. *See* Doc. 47 at

**DISCUSSION**

**1. Wrongful Termination Claim**

Plaintiff contends that defendants terminated his employment because of his disability, in violation of the ADA and the RA. Because there is no direct evidence of discrimination, Corbin's claim turns on the traditional *McDonnell Douglas* burden-shifting analysis. *See, e.g., Holly v. Clairson Industries, L.L.C.,* 492 F.3d 1247, 1255 (11th Cir. 2007) ("Under the controlling law in this Circuit, the burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims.")(citation and internal punctuation omitted); *Cleveland v. Home Shopping Network, Inc.,* 369 F.3d 1189, 1193 (11th Cir. 2004)(applying *McDonnell Douglas* circumstantial evidence framework in ADA context); *Wascura v. City of South Miami,* 257 F.3d 1238, 1242 (11th Cir. 2001) ("In the absence of direct evidence of discrimination, a plaintiff may establish a *prima facie* case of an ADA violation . . . using the familiar burden-shifting analysis employed in Title VII employment discrimination cases.") (footnote omitted).

---

22 ("Jackson Hospital's decision to ask Ms. Carpenter to resign the same day as Mr. Corbin was given his notice supports Mr. Corbin's claim that he was subjected to disparate treatment."). However, because this claim is not pled in the complaint, it is not before the court. Pursuant to Federal Rule of Civil Procedure 8(a), a plaintiff's complaint or amendments thereto must set out the plaintiff's claims for relief, and "[a] plaintiff cannot amend a complaint through an argument in a brief opposing summary judgment." *Nickson v. Jackson Hosp. & Clinic Inc.*, 2017 WL 4366735, at *4 (M.D. Ala. Sept. 29, 2017) (citing *Hall v. Dekalb Cty. Gov't*, 503 F. App'x 781, 786 (11th Cir. 2013)). Nevertheless, the court has considered this claim on its merits and, based on the same reasons discussed *infra* concerning the other claims, it arrives at the same conclusion – that is, the plaintiff cannot show that the defendant's proffered reason is pretext, nor can he establish a *prima facie* case. The defendant is thus entitled to summary judgment on plaintiff's purported disparate treatment claim.

Under this approach, the burden initially rests with the plaintiff to establish a *prima facie* case of discrimination, after which the burden of production shifts to the defendant to articulate a legitimate non-discriminatory reason for the challenged action. *See Cleveland,* 369 F.3d at 1193; *Wascura,* 257 F.3d at 1242-43. After a non-discriminatory reason is given, the plaintiff is "left with the ultimate burden of proving that [the defendant] intentionally discriminated against her because of her disability." *Cleveland,* 369 F.3d at 1193; *see also Wascura,* 257 F.3d at 1243.

To establish a *prima facie* case under the ADA and the RA, Corbin must show (1) that he has a disability; (2) that he is a qualified individual, meaning that he can perform the essential functions of his job, with or without a reasonable accommodation; and (3) that the employer discriminated against him because of his disability. *See Greenberg v. BellSouth Telecommunications, Inc.,* 498 F.3d 1258, 1263 (11th Cir. 2007).

First, the defendant contends that plaintiff cannot establish a *prima facie* case of discriminatory discharge because he does not have a disability under the ADA or RA. Doc. 28 at 10-11. Corbin maintains that he is disabled under the ADA. Doc. 47 at 7-8.

The ADA defines a disability as (1) a physical or mental impairment that substantially limits one or more major life activities, (2) a record of such impairment, or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(1). Under the ADAAA, the term "substantially limits" is to be broadly interpreted so as to allow for the greatest coverage. *Cooper v. CLP Corp.*, No. 2:13-CV-02152-JEO, 2015 WL 9311964, at *3 (N.D. Ala. Dec. 23, 2015). The ADAAA provides that "sleeping" is an example of a major life activity. 42 U.S.C. § 12102(2)(A).

As noted above, the plaintiff alleges that he suffers from narcolepsy with cataplexy. It is undisputed that narcolepsy is a physical impairment, so Corbin must only show, to qualify under the first prong, that his narcolepsy substantially limits a major life activity. *See Abbott v. Elwood Staffing Services, Inc.*, 44 F. Supp. 3d 1125, 1166 (N.D. Ala. July 31, 2014) ("even assuming that the plaintiff had a pregnancy related impairment, the plaintiff was not suffering from a disability unless that impairment *substantially limits a major life activity*") (emphasis in original). The court finds that the plaintiff has demonstrated that he has a disability under the ADAAA. The plaintiff testified that the narcolepsy with cataplexy limits him in a substantial way. Although he is still able to work and participate in other life activities, he has increased sleepiness and memory loss. *See* Doc. 47-1 at 3-4. Certain work schedule changes, such as an earlier start time, would have made it either very difficult or impossible for him to do his job due to his disability. *Id.* at 17.

Corbin also argues that he is a qualified individual under the ADA because he is able to perform the essential functions of his position, with or without reasonable accommodation. *See* Doc. 47 at 9-10. Jackson does not appear to contest the second prong of Corbin's *prima facie* case. *See* Doc. 28 at 9.

Finally, the defendant contends that plaintiff cannot establish the third prong of a *prima facie* case because Corbin was not discriminated against due to his narcolepsy with cataplexy, since there is no evidence that the decisionmaker possessed actual knowledge of his disability at the time of the termination decision. It is well-established in this circuit that "a decision-maker who lacks actual knowledge of an employee's disability cannot fire

the employee 'because of' that disability." *Cordoba v. Dillard's, Inc.,* 419 F.3d 1169, 1186 (11th Cir. 2005). In other words, "an employee cannot be fired 'because of' a disability unless the decisionmaker has *actual* knowledge of the disability." *Id.* at 1185 (explaining that constructive knowledge is not enough); *see also Howard v. Steris Corp.*, 550 Fed.Appx. 748, 751 (11th Cir. 2013) ("Liability under the ADA requires the employer to have discriminated because of the employee's disability as the employer had *actual* knowledge of the alleged disability at the time it took adverse employment action."). Therefore, as part of his *prima facie* showing, plaintiff must present evidence that Riley and James, the individuals charged with the termination decision, had actual knowledge of his disability. Notably, Carpenter was not involved in Corbin's termination; in fact, she herself was forced to resign. *See* Doc. 47-19 at 3-4.

While James does not unequivocally say that he was unaware of plaintiff's disability at the time he and Riley decided to terminate Corbin's employment, James does aver that the decision was based on the JTT report and the Microsoft licensing issue, and plaintiff offers no evidence to the contrary. *See* Doc. 47-19 at 3-4. Also, plaintiff presents no evidence that Riley had actual knowledge of his disability.[8] For the foregoing reasons, Plaintiff cannot establish a *prima facie* case of disability discrimination under either the ADA or the RA.

---

[8] Riley was not deposed, and did not submit an affidavit.

## A. Defendant's Stated Reasons for the Termination

Even if Corbin has established a *prima facie* case, Jackson argues that it is entitled to summary judgment because Corbin cannot demonstrate that the reason given for the termination is pretext. *See* Doc. 28 at 14-15. Jackson maintains that it terminated Corbin's position based on recommendations contained in the JTT report and due to the issues with the Microsoft licenses.

Shortly after becoming Jackson's new VP and COO, James was presented with JTT's final report. *See* Doc. 47-19 at 3. The JTT report underscored significant problems within the IT department's infrastructure team, particularly with Corbin's reportedly poor management. *Id.* In order to address JTT's findings and recommendations, Riley and James discussed restructuring the IT department and its management. *Id.* [9]

While JTT was conducting its review, Microsoft was conducting a software audit. *Id.* The IT department and its leadership team, Carpenter and Corbin, were responsible for maintaining software licensing. *See* Doc. 48 at 15-16. As part of its report, JTT warned that Microsoft imposes significant financial penalties on companies whose software licenses are not in compliance. *See* Doc. 47-19 at 3. In October of 2013, Microsoft determined that Jackson was not in compliance and asked for payment, by November of 2013, of over $300,000.00 as a consequence. *Id.* On November 11, 2013, Corbin was informed by letter

---

[9] Corbin does not specifically dispute the problems highlighted in the JTT report. He argues only that the issue with the licenses was not actually his fault, given that, according to Carpenter's deposition, someone else was perhaps responsible for actually organizing the payment of the licenses. However, Carpenter herself, and also James, testified that both Carpenter and Corbin were responsible for the Microsoft licensing issue.

from Darrington that Jackson had eliminated his position and that his employment was terminated. *See* Doc. 47-12; *see also* Doc. 47-13. Darrington avers that he was present at a subsequent meeting at which the issue with the Microsoft licenses was cited, at least in part, as the reason for the removal of both Carpenter and Corbin. *See* Doc. 47-2 at 3. Riley, the CEO, and James, the COO, decided to allow Carpenter to resign and to eliminate Corbin's position. *See* Doc. 47-19 at 3-4. According to sworn testimony from James, he and Riley made this decision in response to JTT's report and the fallout from the Microsoft software audit. *Id.* Corbin's position of infrastructure team leader was never again opened or filled. *Id.* at 4.

The relevant question here is whether the plaintiff has adequately demonstrated that the proffered reason for the termination is pretextual. *See McShane v. U.S. Attorney Gen.*, 144 F. App'x 779, 791 (11th Cir. 2005). The plaintiff must show that the termination decision was motivated by discriminatory animus. *Id*. Corbin argues that Jackson's alleged reason for termination is pretextual given that the letter informing him of his termination did not cite the JTT report or the Microsoft licensing issue. *See* Doc. 47 at 14. However, plaintiff's argument does not show that Jackson's stated reason was pretext.

The record indicates that James had received a report from JTT detailing problems within the IT department's infrastructure team and its leadership. James and Riley were also confronted with the issues surrounding the Microsoft licenses and the over $300,000.00 penalty. James contends that his, and Riley's, decision to eliminate Corbin's position was prompted by the JTT report and the Microsoft issue. Nothing before the court suggests that the decision to terminate Corbin was anything but a business decision,

motivated by the defendant's financial and operational interests. Corbin has presented no evidence to establish that his termination was motivated by disability discrimination and has not demonstrated that the defendant's reason for the termination was pretext. Accordingly, as to plaintiff's wrongful termination claim, summary judgment will be granted in favor of the defendant.

### 2.  Reasonable Accommodation Claim[10]

Corbin maintains that Jackson violated the ADA and the RA by refusing his requests for reasonable accommodation for his disability. In particular, plaintiff contends that Jackson unlawfully rejected his request that he not be required to work at night. *See* Doc. 1 at 9. Defendant argues that plaintiff's reasonable accommodation claim should be dismissed because plaintiff cannot establish a *prima facie* claim of disability discrimination and because plaintiff never specifically requested an accommodation. As discussed in § 1 of this opinion, plaintiff is unable to establish a *prima facie* claim of disability discrimination. Still, the court will examine his contentions under the relevant standards for a reasonable accommodation claim.

As a threshold matter, the law is clear that "an employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under

---

[10] The plaintiff has abandoned this claim by failing to brief the issue. *See* Doc. 47; *see also Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta,* 219 F.3d 1301, 1326 (11th Cir. 2000) ("[F]ailure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."). Nevertheless, the court will consider the claim on its merits.

the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship." *Holly*, 492 F.3d at 1262 (emphasis in original).

In the reasonable accommodation context, the ADA "envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *Harris v. Mills,* 572 F.3d 66, 75 (2nd Cir. 2009) (quoting *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000)). Because the interactive process imposes shared obligations on employers and employees, an employer cannot be liable for failure to accommodate if a collapse in that process is attributable to the employee. *See E.E.O.C. v. Sears, Roebuck & Co.,* 417 F.3d 789, 796 (7th Cir. 2005) ("If a disabled employee shows that her disability was not reasonably accommodated, the employer will be liable only if it bears responsibility for the breakdown of the interactive process."); *Toronka v. Continental Airlines, Inc.,* 411 F. App'x 719, 725 (5th Cir. 2011) ("An employer is not, however, liable if the breakdown in the interactive process is traceable to the employee.").

The legal principle on which Corbin's claim founders is that an employer's "duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.,* 167 F.3d 1361, 1363 (11th Cir. 1999). Indeed, "before an employer's duty to provide reasonable accommodations—or even to participate in the 'interactive process'—is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice." *E.E.O.C. v. C.R. England, Inc.,* 644 F.3d 1028, 1048 (10th Cir. 2011). In order for a request to be sufficient to trigger an employer's duty, the employee

must connect the requested accommodation to his disability. *See Williamson v. Clarke County Department of Human Resources*, 834 F. Supp. 2d 1310, 13 20 (S.D. Ala. 2011) ("[A]t a minimum, the employee must request some change or adjustment in the workplace *and* must link that request to his disability, rather than simply presenting the request in a vacuum.") (emphasis in original).

Viewing the evidence in the light most favorable to the plaintiff, Corbin informed Carpenter that he had been diagnosed with narcolepsy with cataplexy. *See* Doc. 47-1 at 16. However, Corbin admits that he does not believe that he "ever requested any type of accommodation" for his narcolepsy. Doc. 27 at 15. Plaintiff claims that there was never any reason to request an accommodation due to the nature of his work. *Id.* Plaintiff does contend that he would "if it came up . . . perhaps remind [Carpenter] that it would be difficult for [Corbin] to" work evenings. *Id.* at 18-19. Plaintiff also testified that Carpenter did attempt to change his job description in order to force him to work in the evenings. *See* Doc. 47-1 at 21. However, Carpenter was advised that she could not change Corbin's job description "after the fact." *Id.*

Plaintiff's insurmountable problem is that, by his own admission, he never *actually* requested an accommodation from his supervisors, much less told them that such an accommodation would be due to his disability. In his complaint, plaintiff makes the unfounded claim that Jackson "fail[ed] or refus[ed] to transfer him to another position." Doc. 1 at 10. However, plaintiff presents no evidence that he ever even requested such a transfer. Because plaintiff did not make a specific request for an accommodation, the defendant was not required to speculate that plaintiff's reported narcolepsy required any

particular accommodation. The responsibility was Corbin's to inform Carpenter that because of his narcolepsy, he needed a particular accommodation; instead, he merely informed Carpenter of his disability, *see* Doc. 47-1 at 16, and submitted his diagnosis, *see* Doc. 47-6, to be included in his personnel file.

The court finds that plaintiff did not make an "adequate request" that was sufficient to put his employer on notice. Given these facts, and in light of the above case authority, Jackson cannot be liable for failure to provide a reasonable accommodation under the ADA or the RA. The defendant is entitled to summary judgment on this claim.

### 3. Retaliatory Hostile Work Environment Claim[11]

The Eleventh Circuit has not yet recognized a cause of action for a retaliatory hostile work environment under the ADA. *See Menzie v. Ann Taylor Retail, Inc.*, 549 F. App'x 891, 896 n.9 (11th Cir. 2013) ("We have never held in a published opinion that a hostile work environment claim is available under the ADA."). The Court, though, has recognized a cause of action for a retaliatory hostile work environment under Title VII. *See Gowski v. Peake*, 682 F.3d 1299, 1311-12 (11th Cir. 2012).

Both the ADA and Title VII share comparable frameworks, and the key language in the two statutes is virtually indistinguishable. *Haysman v. Food Lion, Inc.*, 893 F. Supp. 1092, 1106 (S.D. Ga. 1995) ("It would seem illogical to hold that ADA language identical to that of Title VII was intended to afford disabled individuals less protection than those groups covered by Title VII."). Assuming, without deciding, that plaintiff is entitled to

---

[11] The plaintiff has abandoned this claim as well. *See supra* note 10. However, the court will address it briefly.

bring a cause of action for a retaliatory hostile work environment under the ADA, the court will examine the plaintiff's claim under *Gowski*, the governing Title VII case on this issue.

To prevail on a retaliatory hostile work environment claim, Corbin must show (1) that he engaged in protected activity; (2) that, after doing so, he was subjected to unwelcome harassment; (3) that the protected activity was a "but for" cause of the harassment; (4) that the harassment was sufficiently severe or pervasive to alter the terms of his employment; and (5) that the employer is responsible for the environment under either vicarious or direct liability. *See Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1248-49 (11th Cir. 2014).

Here, the plaintiff cannot show that his protected activity was a "but for" cause of any harassment, or that such harassment was sufficiently pervasive or severe to alter the terms of his employment. *See Shaling v. UPS Ground Freight*, 202 F. Supp. 3d 1283, 1289-95 (N.D. Ala. 2016) (where the plaintiff filed over twenty grievances, and each grievance was in response to a specific event, the court determined that the alleged conduct was sufficiently pervasive and that the claims should be decided by a jury).

Whether harassment is "severe or pervasive" is determined by applying both objective and subjective components of the test. *Gowski*, 682 F.3d at 1312. A plaintiff can satisfy the subjective component by showing that he "subjectively perceiv[ed]" the alleged harassment as severe or pervasive enough to change the terms of his employment. *Id.* The objective component requires a showing that the alleged harassment created an environment that a reasonable person would find hostile or abusive. *Id.* In the instant case, the court concludes that even if the plaintiff subjectively perceived the alleged harassment

as severe or pervasive enough to change the terms of his employment, a reasonable person would not have done so.

In applying the objective component, courts consider "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Gowski*, 682 F.3d at 1312 (quoting *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002)). "One isolated incident of sexually inappropriate behavior will not amount to actionable sexual harassment unless the incident is 'extremely serious[,]'" and a "one-time, ambiguous comment" is "insufficiently severe to amount to actionable sexual harassment." *McMillian v. Postmaster Gen., United States Postal Serv.*, 634 F. App'x 274, 277 (11th Cir. 2015).

As evidence of a hostile work environment, Corbin says that he felt pressured by Carpenter to explain his condition publicly at a department meeting following his diagnosis. *See* Doc. 47-1 at 22. Additionally, Carpenter notified a vendor that Corbin would not be available in the early morning or late at night due to his narcolepsy. *Id.* at 23. Finally, Samantha Ivery claims to have once heard someone at work make a joke about narcolepsy during her time as a member of Jackson's IT department; Ivery, however, could not recall any specifics regarding the joke, including the employees who may have been involved or the subject of the joke. *See* Doc. 47-4 at 19. Similarly, Andy Johnson, a former member of Jackson's IT department, claimed that Corbin's "narcolepsy was a joke in the IT department," but he failed to elaborate on this conclusory assertion with any specific details. *See* Doc. 47-17 at 3. Although it is possible that Corbin felt uncomfortable at work

due to the actions of Carpenter or other employees, Corbin has not shown that those actions rise to the level of a hostile work environment. Consequently, the defendant is entitled to summary judgment on this claim.

### 4. ADA Retaliation Claim

Corbin's ADA retaliation claim is based on the allegation that Jackson retaliated against him for engaging in the "protected activity" of filing complaints against Carpenter for disability discrimination. The Eleventh Circuit "assess[es] ADA retaliation claims under the same framework used in Title VII." *Palmer v. McDonald*, 624 F. App'x 699, 702 (11th Cir. 2015) (citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997)).

To establish a *prima facie* case of ADA retaliation, a plaintiff must demonstrate (1) that he engaged in a statutorily protected expression, (2) that he experienced an adverse employment action, and (3) that there was a causal link between the two. *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016). If a plaintiff establishes a *prima facie* case, the defendant must present a legitimate, non-discriminatory reason for the adverse employment action. *Davis v. Postmaster General*, 550 F. App'x 777, 779 (11th Cir. 2013). If the defendant meets this burden, "the burden shifts back to the plaintiff to show that the proffered explanation is a pretext for retaliation." *Id.*

Here, Jackson argues that Corbin's ADA retaliation claim fails because he cannot establish a causal link between the protected activity and his termination. *See* Doc. 48 at 7-9. Jackson further contends that it had legitimate, non-discriminatory reasons for terminating Corbin and that those reasons are not pretextual. *Id.* at 10. Corbin maintains

that his complaints were the reason for his termination, and that Jackson's supposed reasons for terminating him are nothing more than pretext. *See* Doc. 47 at 15-23. The parties do not dispute that Corbin engaged in a protected activity and that he suffered an adverse employment action. The court will thus examine whether there is a causal connection between the two in order to determine whether the plaintiff has established a *prima facie* ADA retaliation claim.

To prevail on his ADA retaliation claim, Corbin must show that his protected activity was a "but for" cause of his termination. *Frazier-White*, 818 F.3d at 1258. In order to establish "a causal connection, the plaintiff must show that the decisionmaker was aware of his protected conduct, and that the protected activity and adverse action were not wholly unrelated." *Clemons v. Delta Air Lines Inc.,* 625 F. App'x 941, 945 (11th Cir. 2015); *see also Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action.").

On February 11, 2013, Corbin filed his first complaint alleging that Carpenter was discriminating against him based on a disability. *See* Doc. 47-20. On September 19, 2013, Corbin presented a lengthy second complaint detailing his interactions with Carpenter, among others, and the discrimination that he allegedly suffered due to his disability. *See* Doc. 47-8. Less than two months after this latest complaint, Corbin was fired. *See* Doc. 47-12; *see also* Doc. 47-13. This "close temporal proximity" is enough to establish a causal connection between the protected activity—Corbin's complaints based disability

discrimination—and his termination. Consequently, Corbin has established a *prima facie* case of ADA retaliation.

### A. Defendant's Stated Reasons for the Termination

Upon the determination that Corbin has established a *prima facie* claim of ADA retaliation, the burden shifts to Jackson to articulate legitimate, non-discriminatory reasons for Corbin's termination. As detailed in § 1(A) of this opinion, Jackson has done so.

Because Jackson has articulated legitimate, non-discriminatory reasons for terminating Corbin, "the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Wilson v. B/E Aerospace*, 376 F.3d 1079, 1087 (11th Cir. 2004). To meet his burden, Corbin must show both (1) that the reasons articulated by Jackson for his termination are not true, and (2) that the real reason for his termination was discrimination. *See Cleveland,* 369 F.3d at 1193-94; *see also Wascura,* 257 F.3d at 1243 ("If the plaintiff fails to proffer sufficient evidence to create a genuine issue of material fact as to whether each of the defendant's proffered reasons is pretextual, the defendant is entitled to summary judgment.").

Here, Corbin argues that the decision to terminate his employment was actually made in October of 2013, and that Jackson only delayed implementing that decision in case Corbin's IT expertise was needed. *See* Doc. 47 at 21. However, even if the decision were made in October, Jackson's reasons are still applicable given that James received the JTT report and its recommendations as soon as he started at Jackson in early September of 2013.

*See* Doc. 47-19 at 1-3. Also, it was in October of 2013 that Microsoft determined that Jackson's software licenses were out of compliance. *Id.* at 3.

Corbin also contends that the Microsoft licensing issue was a pretextual reason for his termination given that the licenses were neither his nor Carpenter's responsibility. *See* Doc. 47 at 22. In support of this contention, Corbin cites only to Carpenter's testimony that Peter Vandervoort was possibly responsible for organizing the payment of the Microsoft licenses. *See* Doc. 47-3 at 6. But Carpenter also testified that she and Corbin were both at fault for the Microsoft licensing issue. *See* Doc. 48 at 15-16. Thus, Carpenter's testimony actually supports the contention that Corbin and Carpenter were fired, at least in part, due to the licensing issue.

Even construed in a light most favorable to Corbin, the facts do not point to pretext. Instead, Jackson has articulated legitimate, non-discriminatory reasons for terminating Corbin stemming from the JTT report, which cited Corbin's poor management, and the Microsoft licensing issue. Jackson's stated reasons are supported by sworn testimony; Corbin's are merely conclusory. Corbin has failed to make a showing sufficient for a jury to find that the reasons cited by Jackson are not true, much less that the true reason for his discharge was retaliatory discrimination. Thus, the court concludes that Jackson is entitled to summary judgment as to Corbin's ADA retaliation claim and the claim is due to be dismissed.

## CONCLUSION AND ORDER

For the foregoing reasons, it is ORDERED as follows:

(1) Defendant's motion for summary judgment, *see* Doc. 27, is GRANTED, and

summary judgment is hereby entered in defendant's favor on all claims.

(2) The Clerk of Court is DIRECTED to close this file.

A separate final judgment will be entered.

Done, on this the 3rd day of December, 2018.

/s/ Susan Russ Walker
Susan Russ Walker
United States Magistrate Judge